S. I. HOOVER, Appellant, v. D. H. HEDRICK et al., Appellees.

WILLS: Probate—Action to Set Aside—Impostor—Evidence. Evidence reviewed, and held to show that plaintiff, seeking to set aside the probate of a will as an heir of the testate, was an impostor.

ACTIONS: Joinder—Improper Joinder—Defendant Acquiescing in Joinder—Effect. He who improperly joins causes of action and prays for relief accordingly, may not complain that defendant acquiesced in the misjoinder and met the misjoined action defensively and with a counterclaim. Misjoinder does not go to the jurisdiction of the court. So held where plaintiff, *with an action to set aside the probate of a will,* joined an alleged cause of action against defendant to set aside and annul, in his own behalf, certain alleged fraudulent contracts obtained by defendant for part of the estate.

ACTIONS: Necessary Parties—Dismissal of Necessary Party—Power of Court to Order Party Brought in. A plaintiff may not, by dismissing his action as to one whose presence as a defendant is *necessary* to a full determination of the matter before the court, deprive the court of jurisdiction to order such *necessary* party again brought in as a defendant. A party plaintiff may not, in all cases, dictate who shall be parties defendant. So held where plaintiff, in an action to set aside the probate of a will, dismissed his action as to one of the *legatees,* the court later ordering such legatee brought in as a defendant. (Sec. 3466, Code, 1897.)

ACTIONS: Parties—Genuineness of Parties—Impostor—Power of Court. Whether or not a plaintiff is a mere intermeddler—an impostor—and consequently without any interest in the subject-matter of the litigation, and without right to the time and attention of the court, is a question which may be inquired into at any stage of the litigation, and in such reasonable manner as the court may determine, and whether on the law or equity side of the calendar.

APPEAL AND ERROR: Parties Entitled to Allege Error—Impostor. A plaintiff who is demonstrated by the record to be an impostor, and consequently without any interest in the litigation, may not complain of the form of the decree as it affected the actual parties in interest, or of any other merely erroneous action of the court.

EVIDENCE: Documentary Evidence—Order of Court to Produce—
6  Refusal to Obey Order—Consequences. Whether the court has,
   independent of statute (Secs. 4656, 4667, 4668, Code, 1897), in-
   herent power to order the *dismissal* of a petition because of a
   refusal or failure by plaintiff to obey an order' for the production
   of certain documentary evidence, *quære;* but attention is called
   to the fact that an order "that the allegations of defendant's
   pleadings be taken as true" (as provided by statute) would, or
   might, work a more drastic result than a dismissal.

APPEAL AND ERROR: Parties Entitled to Allege Error—Impostor.
5, 7

*Appeal from Ida District Court.*—F. M. POWERS and M. E.
HUTCHISON, Judges.

FRIDAY, JANUARY 14, 1916.

REHEARING DENIED MONDAY, JANUARY 15, 1917.

ACTION to set aside the probate of the will of Margaret
McHugh. The petition prayed also for other relief. The
various defendants filed answers, counterclaims, and cross-
petitions. Because of the refusal of the plaintiff to comply
with a certain order of the court, his petition was by the
court dismissed. A trial on the merits was later had upon
the counterclaims, and a decree was entered therein against
the plaintiff and in favor of the defendants as counterclaim-
ants. The plaintiff has appealed from the order dismissing
his petition, and from the final decree.—*Affirmed.*

*O. T. Naglestad, J. C. Walter* and *L. H. Salinger,* for
appellant.

*Johnston Brothers, W. A. Helsell, M. M. White* and *E. J.
Stason,* for appellees.

EVANS, J.—Margaret McHugh died testate in Ida County
in February, 1912, leaving a considerable estate. She was
the widow of Alexander McHugh, who had died two or three
years previously. She left surviving her,
as supposed, one child only, Robert Leroy
Hoover, a son by a former marriage. By her

1. WILLS: probate:
   action to set
   aside: impostor:
   evidence.

former marriage, she was the wife of Pembroke Hoover, and lived for many years in Cedar County, Iowa. Many years ago she was divorced from Hoover, and was thereafter married to McHugh. There were no children of this marriage, nor was McHugh survived by any children of his own. By the decree of divorce from Hoover, the plaintiff mother was awarded the custody of her child, Robert Leroy Hoover. It appears, however, that, notwithstanding such provision of the decree, the child made his home with the paternal grandparents at Cadillac, Michigan, and was known little, if at all, in the later home and surroundings of his mother. By the will of Mrs. McHugh, as originally drawn, no provision was made for the son. The principal beneficiaries therein named were the defendants Hedrick, Simmons and Meyers. The larger benefit went to Hedrick as residuary legatee. By a codicil to the will, a bequest of $10,000 was made to Robert Leroy Hoover. The will and codicil being filed for probate, Robert Leroy Hoover started a contest by filing objections thereto. A contract of settlement was effected between Hedrick as a proponent and Hoover as a contestant, whereby Hedrick agreed to pay to Hoover, partly in specified real estate located in Iowa and elsewhere, the sum of $130,000. Thereafter, the will and codicil were duly admitted to probate.

Some time thereafter, and prior to March 1, 1913 (the actual date not appearing here), the plaintiff instituted an action to set aside the probate of the will of Margaret McHugh, on the ground of her alleged mental incompetency and on the ground of alleged undue influence of Hedrick, the principal beneficiary of her will. The petition also attacked the certain contract of settlement between Hedrick and Robert Leroy Hoover already referred to, and alleged that the same was obtained from Hedrick by Robert Leroy Hoover upon the false and fraudulent representations that he was an heir of Mrs. McHugh's, whereas he was, in fact, not such, and the petition prayed that such contract be set

aside. The nature of plaintiff's interest in the estate was alleged to be that he was the only child of his deceased father, who was the son of Mrs. McHugh. The defendants all answered, and filed various affirmative pleadings. We shall not deal in detail with all of them. They all denied the interest of the plaintiff, and challenged his alleged relationship and identity. Robert Leroy Hoover filed a counterclaim against him, which, in effect, asked to quiet his title to the real estate claimed by him by virtue of the contract with Hedrick. He also filed a cross-petition against his codefendant, Hedrick, asking for a specific performance of the contract, Hedrick having hesitated to perform when the plaintiff appeared with his claim of relationship. The real question, which became decisive in the court below and which becomes decisive of this appeal, is whether the plaintiff is what he pretends to be, a grandson of Mrs. McHugh's, or whether he is an intentional impostor.

The answering defendants attached various interrogatories to their pleadings. The plaintiff purported to answer these. Some of these will be set forth herein later. The plaintiff answered therein that his father's name was Richard G. Hoover, and that he was the son of Pembroke Hoover and Margaret Simmons Hoover, and that he lived in Cedar County, Iowa. Mrs. McHugh's maiden name was Simmons, her first husband was Pembroke Hoover, and her home was Cedar County. Answering one of the interrogatories, the plaintiff stated as follows:

"A. 8. A Bible kept by my grandfather, Pembroke Hoover, shows the birth of my father, Richard G. Hoover, to him and Margaret Simmons Hoover, in pen and ink."

A motion was filed by the defendants for an order requiring the production of the record above referred to. Over the resistance of the plaintiff, such order was entered. A month later, such order having been wholly ignored by the plaintiff, a rule was issued ordering him to show cause why he had not complied with the order of the court. A further

order was entered to the effect that, unless the order were complied with by a future date therein fixed, or showing made that he could not comply with the order, his petition would be dismissed. Upon the date so fixed, the parties again appeared before the court, the plaintiff being represented by his counsel. No compliance with the order had been made, nor any showing of excuse. A final opportunity being given to counsel to make such showing, if any, as they desired, they declared in effect that they would make none. Thereupon, the court dismissed the petition, and continued the case on the counterclaims and cross-petitions. The case on the counterclaims came to trial two terms later.

Reference should be made here to certain other proceedings had before the striking of plaintiff's petition. The plaintiff had, by various pleadings, including a demurrer, resisted the filing of the counterclaims, on the general ground that they were not germane to the issue tendered by the petition, and that they could not be interposed in an action at law to set aside the probate of a will, and that their filing was an attempt to deprive the plaintiff of the right of jury trial, and to force the trial to the equity side. The court allowed the counterclaims to stand, but ordered that the equitable issues therein should be tried in equity, and that the issue as to the setting aside of the probate of the will should be tried at law, and should be first tried, if tried, at the following term. At the final trial of the equitable issues on the counterclaims, the trial court found that the plaintiff had no interest in the litigation, in that he sustained no relationship whatever to Mrs. McHugh. A decree quieting title against him was entered in favor of the counterclaimants. The general nature of the complaint made by the appellant on this appeal is that the trial court acted in excess of its jurisdiction, in dismissing the petition for the alleged contemptuous conduct of the plaintiff; that its only power was to continue until compliance with its order was had; that the court erred in entertaining jurisdiction of the counter-

claims, and that it exceeded its jurisdiction therein; that the decree, in effect, precluded the plaintiff from trying to a jury the law issues tendered in his petition as to the setting aside of the probate of the will; that it, in effect, closed the door of the statute of limitations against him, even though, under the statute, he was entitled to five years to begin another action; and that it was beyond the power of the court so to do. The emphasis of the appeal is laid upon the want or excess of jurisdiction. For reasons hereinafter appearing, the appellant is in no position to complain of a merely erroneous procedure.

I. Before proceeding to a consideration of the points and argument of appellant, we deem it appropriate to look at the facts of the case pertaining to plaintiff's interest in the litigation, as these facts were developed by proceedings subsequent to the dismissal of his petition, which led to the final decree. The trial court never lost personal jurisdiction over the plaintiff, however erroneous its procedure, if at all. Indeed, the plaintiff continued to be represented by his counsel at all stages of the proceedings, including the taking of important depositions where full cross-examination was had. When the final trial was reached, counsel for plaintiff asked for an abatement of this branch of the case until a trial could be had on the law issue tendered in the former petition. This was refused by the court, and the trial proceeded. The record discloses that at this point plaintiff's attorneys left the court room. This action on their part could not, of course, defeat the jurisdiction of the court over the person of the plaintiff. If it was properly found that the plaintiff sustained no relationship to Mrs. McHugh, then he has no right to pursue his purported litigation, or to submit any issue either to jury or to court. In other words, his identity or relationship to Mrs. McHugh stands at the threshold of his right to litigate at all, not only the questions of fact, but questions of law and procedure as well.

The plaintiff made the following answers to certain interrogatories attached to the pleadings of Hedrick:

"A. 1.  My full name is Stuart Isaac Hoover.

"A. 2.  I was born December 1st, 1884, in Eau Claire County, Wisconsin.

"A. 3.  There was no public record kept of my birth to my knowledge.

"A. 4.  There was no private record preserved of my birth to my knowledge.

"A. 5.  The full name of my father was Richard G. Hoover.

"A. 6.  I do not know when my father was born; he was born about 1860.

"A. 7.  I don't know of any public record of my father's birth.

"A. 8.  A Bible kept by my grandfather, Pembrook Hoover, shows the birth of my father, Richard G. Hoover, to him and Margaret Simmons Hoover, in pen and ink.

"A. 9.  I do not know when nor where my father and mother were married.

"A. 10.  I do not know full maiden name of my mother.

"A. 11.  I do not know when and where my mother was born, nor do I know the name of her father or mother, nor do I know their address and I cannot say whether they are dead or living.

"A. 12.  I do not know the names of my mother's brothers and sisters, nor do I know their addresses.

"A. 13.  I do not know of any uncles and aunts of my mother who are living, nor do I know their residences.

"A. 14.  My father and mother died about 1891, in a forest fire in Wisconsin. I remember seeing the fire at the time.

"A. 15.  There is no tombstone or monument erected to the memory of my father and mother, to my knowledge.

"A. 16.  I have lived in Wahoo, Saunders County, Ne-

braska, about eight months, and I lived there with William
Hilliard, but I do not know his present address; and I lived
in Beatrice, Gage County, Nebraska, about eight months,
and lived with William Hilliard, but I do not know his pres-
ent address; and I lived in Goodland, Kansas, about four
months, with William Hilliard, but I do not know his present
address; and I lived in St. Joe, Buchanan County, Missouri,
about one and one-half years, and I boarded at different
boarding houses, the names of which I do not remember; but
they were located in South St. Joe, Missouri. And I lived in
Kansas City, Missouri, about five years, and while there I
boarded at different boarding houses, and worked at such
labor as I could obtain; and it is so long ago since I left Kan-
sas City, Missouri, that I cannot recall the name or names of
any of the people who kept the boarding houses at which I
boarded; and I lived in the state of Wyoming about two years,
engaged in working on the Union Pacific Railroad, on its line
through the state, and I boarded at the different railway
camps along the railway through the state; and at the time
I did not know, and do not know, the names of the different
counties in which I worked along said line of railway, and I
cannot recall the name or names of any of the persons that
I worked with, for the reason that the persons were of dif-
ferent nationalities, and the most of whom could not speak
the English language, and we were strangers to each other.
And then I worked in the harvest fields in Kansas for one
season among strangers. I do not know their names; and
then I worked on a truck farm, two years, at East Peoria,
Illinois. I lived with a person named Jacob Hihouse. I do
not know his present address. And then I went to Dane
County, Wisconsin, and worked with a threshing machine
crew one season, and lived with a man by the name of
———— Bacon. I do not know his given name, nor do I
know his address. Then I went to Spring Green, Wisconsin,
and lived there two years, engaged in real estate business

and farming, and I boarded at a hotel. Mr. L. Lawson, who kept the hotel, sold out and left the place, and I do not know his present address. Then I went to Richland Center, Wisconsin, where I am now living.

"A. 17. I do not know the names of the places at which my father lived, but he worked in different lumber camps in Wisconsin, nor do I know the names of the people for whom he worked.

"A. 18. William Hilliard knew my father during his lifetime; George Signer knew my father in his lifetime. Isaac Lynberger knew my father in his lifetime, and Chris Scholl also knew my father in his lifetime.

"A. 19. The address of William Hilliard was Goodland, Kansas; the address of George Signer is Spooner, Wisconsin; the address of Chris Scholl is Chicago, Illinois; and the address of Isaac Lynberger is Minneapolis, Minnesota.

"A. 20. Yes.

"A. 21. Thomas Northrup, of Ida Grove, Iowa, as I am informed and believe.

"A. 22. I do not know the names and present addresses of uncles, brothers, sisters, aunts and cousins of my mother.

"A. 23. Nobody took care of me after the death of my father and mother until I attained my majority, excepting William Shouse, for a period of about three years, and William Shouse and his wife were living at lumber camps in Wisconsin, during the three years that they took care of me, and their last known address to me was a lumber camp in Chippewa County, Wisconsin."

To certain interrogatories attached to the pleading of Robert Leroy Hoover, plaintiff answered as follows:

"Int. 17. What was the name of your grandfather on your father's side? A. Pembroke Hoover, and he married Margaret Simmons in Cedar County, Iowa, so I am informed and believe, and also that she lived with him for about five

years, and about three years afterward, she, Margaret Hoover, married one Alex McHugh, deceased, late of Ida County, Iowa.

"Int. 18. Where was he born, and when? A. I do not know where Pembroke Hoover was born, nor when he was born.

"Int. 19. Where did he die, and when? A. He died about thirty-eight years ago, but I do not know the name of the place where he died.

"Int. 20. How many times was your grandfather on your father's side married, during his lifetime, and what were the names of his various wives, if more than one, before they were married to him? A. I have been informed and believe that he was married twice; the first time to Margaret Simmons; the second time to a woman whose maiden name I do not know. She is now residing in the state of Oregon.

"Int. 21. How many children did your grandfather on your father's side have, and what were their names and ages? A. My grandfather on my father's side had two sons, as issue of his marriage to Margaret Simmons, she having afterward married Alex McHugh, deceased. The name of one son was Richard G. Hoover, my father, who was born about 1860; the name of the other son I do not know, nor the year of his birth. This answer is made on information and belief, and I therefore believe the same to be true.

"Int. 22. Did you ever know your grandfather on your father's side, personally, and if so, when and where did you see him? A. I did not know my grandfather on my father's side, personally; I never saw him.

"Int. 23. Give the various places in which your names of the people with whom he lived and for whom he worked? A. I do not know where my father lived previous to his marriage, nor do I know the names of the people with whom he lived, and for whom he worked.

"Int. 24. What was the color of your father's eyes?
A. I do not remember the color of my father's eyes.

"Int. 25. What was the color of your father's hair?
A. I do not remember the color of my father's hair.

"Int. 26. Did your father have a finger missing on either hand? A. I have no recollection as to that and do not know.

"Int. 27. Did your father ever live in Cadillac, Michigan, and if so, when and with whom did he live, and how long did he live with such person? A. I do not know of my father ever living at Cadillac, Michigan.

"Int. 28. How large a man was your father, i. e., how many feet tall was he, and how many pounds did he weigh? A. I do not know how many feet tall my father was, nor how much he would weigh.

"Int. 29. Where is the body of your father buried? A. The body of my father was burned up in a forest fire in the state of Wisconsin.

"Int. 30. Is there a tombstone or monument erected to the memory of your father, and if so, where is it, and when was it erected? A. There is no tombstone or monument erected to the memory of my father, to my knowledge."

It will be noticed from the foregoing that no information is contained as to the present whereabouts of any person who could connect the plaintiff either as the son of Richard G. Hoover or as the grandson of Pembroke and Margaret Hoover. Some months later, he answered further interrogatories as follows:

"A. 1. I know that I was born in Eau Claire Co., Wisconsin, on December 1, 1884, because William Hilliard, who resided at Goodland, Kansas, told me that I was born on that date and at that place.

"A. 2. I only know of but said William Hilliard, who knew when and where I was born. He told me that I was the only child born to my father and mother, and his last known address to me was Goodland, Kansas.

"A. 3. Since I filed my answers to the previous interrogatories, I have not talked or communicated with any person or persons who knew the time and place of my birth.

"A. 4. I do not know of any person who was present at my birth.

"A. 5. All that I know about my birth is what said William Hilliard told me, as stated in my answer to said Interrogatory 1.

"A. 6. I don't know in whose house I was born.

"A. 7. Since the filing of my answers to the previous interrogatories, I have not learned any additional facts in regard to my mother.

"A. 8. I have answered this interrogatory in my answer to said Interrogatory 7.

"A. 9. I do not know at this time the name of my mother before she married my father.

"A. 10. I do not know the name or names of any relative of my mother.

"A. 11. My father and mother did die in a forest fire about 1891 in Wisconsin, but I do not know the exact location of the fire.

"A. 12. George Signer, deceased, late of Spooner, Wisconsin, and William Hilliard, whose last known address to me was Goodland, Kansas, personally knew of the fire in which my father and mother were burned to death, and they knew of their deaths.

"A. 13. I personally saw the fire when my father and mother were burned to death in it.

"A. 14. I was not rescued from the fire by anyone.

"A. 15. I knew of the death of my father and mother in the said forest fire, because I was personally present at the time of the fire in which my parents were burned to death, and I personally saw the fire.

"A. 16. After said fire I did not remain in the vicinity of the fire, and nobody took me from said fire.

"A. 17. I do remember my father and mother, but I

do not remember how they looked; and the place I last saw them was before said forest fire.

"A. 18.   I have not pictures of my father and mother.

"A. 19.   As I have stated in my answer to Interrogatory 18, I have no pictures of my father or mother.

"A. 20.   I answer this interrogatory by my answers to said Interrogatories 18 and 19.

"A. 21.   I have no pictures of my grandfather Pembroke Hoover, on my father's side.

"A. 22.   Since the filing of my answers to the former interrogatories asked by the defendant Robert Leroy Hoover, I have not talked to or communicated with any person or persons who knew of the fact of the fire in which my father and mother perished.

"A. 23.   Since the filing of my answers to the former interrogatories asked by the defendant Robert Leroy Hoover, I have not talked to or communicated with William Hilliard, Isaac Lynberger, Chris Scholl, William Shouse, or Jacob Hihouse, or any of them.

"A. 24.   William Hilliard and his wife, William Shouse and his wife, Isaac Lynberger and his wife, Chris Scholl, and George Signer are persons that I remember of knowing my father and mother after their marriage.

"A. 25.   Since the bringing of this action I have not personally communicated by letter or otherwise with any persons who knew either my father or my mother.

"A. 26.   I do not remember when the last time was that I saw or heard from William Shouse or his wife.

"A. 27.   Since filing my answer to Interrogatory 23 of defendant D. H. Hedrick, I have not communicated personally with said William Shouse or his wife or any of his family.

"A. 28.   I attended school at Wahoo, Saunders Co., Nebraska.   The next place that I attended school was Goodland, Sherman County, Kansas, and I was living with William Hilliard at the times when I attended these schools.

"A. 29. I first attended school at Wahoo, Saunders Co., Nebraska. I lived at that time with William Hilliard, whose last known address to me was Goodland, Kansas. I attended said school about six months, and I do not remember the name of the school teacher.

"A. 30. I do not personally know the present address of said William Hilliard or of the school teacher who taught the school.

"A. 31. I only went to school to two teachers, and I do not remember the name of either one of them. I don't know their place or places of residence, and cannot state their address or addresses. When I went to those teachers I was only about nine years of age, and I have not gone to school since that time."

Notwithstanding the mist that, according to his answers, appeared to hang over the life of the plaintiff, and to shut him off from the view of many acquaintances, the appellees claim to have found the nest wherein he was born, at Ferris, Illinois, and a number of depositions were taken and introduced in evidence in proof of such fact. The two following depositions are sufficiently illustrative of all on this point:

"F. N. Casburn:

"My name is F. N. Casburn. I am 38 years old, and I live in Ferris, Ill. My business is banking. I have lived in and around Ferris all my life. I know S. I. Hoover, or Stuart Isaac Hoover; I have known him for 20 years. He lived in and near Ferris, Ill., most of the time. I have examined 'Exhibit A,' which is a photograph handed to me by the notary taking this deposition. 'Exhibit A' is a photograph of Stuart Isaac Hoover, the man to whom I have just referred. The father of Stuart Isaac Hoover, or, as he was generally known, S. I. Hoover, was John A. Hoover, and his mother's name was Sarah E. Hoover. Stuart Isaac Hoover has been married and divorced. The maiden name of his wife was Adelaide Davis. I do not call to mind her present address, but it is near Carthage, Ill. The mother of Stuart

Isaac Hoover, Sarah E. Hoover, lives at Adrian, Ill. Stuart Isaac Hoover, or, as he was generally known, S. I. Hoover, had four brothers and two sisters, viz.: Harry Hoover, of Seattle, Wash.; John W. Hoover, of Lamont, Ill.; Albert Hoover, of Ferris, Ill.; Florence Emmert, of Des Moines, Iowa; Mrs. Elsie Scott, of Adrian, Ill.; and George J. Hoover, of Lomax, Ill. I do not know just where Stuart Isaac Hoover has lived the last 3 or 4 years, but it was somewhere in Wisconsin. I have written to him at Madison, Wis., and at Spring Green, Wis. In 1909, he was in Ferris, Ill., assisting in disposing of his father's estate. I think he has been a traveling man of some kind within the last four years.

### Cross-Examination.

"I have known the family of Stuart Isaac Hoover for 20 years. The picture 'Exhibit A,' which I have heretofore identified, is certainly a picture of the man about whom I have been testifying. I knew his father and his mother personally. The family has lived in and about Ferris, Ill., for many years. His father is dead, and died, I think, of heart trouble; he certainly was not burned in any forest fire in Wisconsin."

"F. C. Scott:

"My name is Frank C. Scott. I am 29 years old, and I reside at Adrian, Ill. I am by profession a physician. I know S. I. Hoover, or Stuart Isaac Hoover, and have known him for about 15 years. Up to about four years ago, he lived in and around Ferris, Ill. I have examined the photograph handed me by the notary public, which is marked 'Exhibit A,' and that photograph is a picture of Stuart Isaac Hoover, about whom I have just testified. It is certainly a picture of him. His father's name is John A. Hoover, and his mother's name is Sarah E. Hoover. His father is dead, but his mother is living. I know the family very well. He had four brothers and two sisters. I do not know just where

S. I. Hoover, or Stuart Isaac Hoover, has lived the last four years, but it was somewhere in Wisconsin. He left here in Nov., 1909, and his address after that was Madison, Wis., and Spring Green, Wis.

### Cross-Examination.

"I am a brother-in-law of this Stuart Isaac Hoover; I therefore know him very well. I know it to be a fact that he wrote from Spring Green, Wis., and also wrote from Madison, Wis. The man is about 30 years old. He is a man of light complexion, and light hair. There can't be any doubt about the picture 'Exhibit A' being a picture of the man about whom I am testifying, and his name is Stuart Isaac Hoover."

Substantially the same matters were testified to in the depositions of several other witnesses, residents of the same locality. These included an uncle of Stuart Isaac Hoover's, a brother of his father's; also the attorney for the administrator of his father's estate, to whom Stuart Isaac Hoover receipted for his share of the estate; also the administrator of such estate. All these witnesses knew Stuart Isaac Hoover well, although they had not seen him for 3 or 4 years. They were acquainted with his father and mother and brothers and sisters, and some of them with his grandparents. The uncle testified that the grandparents of Stuart Isaac Hoover were Thomas J. Hoover and Mary E. Hoover. All the witnesses recognized the photograph exhibited to them as that of Stuart Isaac Hoover, whom they knew. The same photograph was identified by witnesses in Ida County, who had met the plaintiff there and identified it unmistakably as his photograph. The photograph is reproduced in the record, and is very clear and apparently free from defects. The plaintiff offered no evidence in denial or explanation of any of this testimony. As to Robert Leroy Hoover, the evidence is overwhelming that he was the only son of Mrs. McHugh. The testimony of his father's relatives was without conflict.

It was shown beyond doubt that Pembroke Hoover, after the divorce, married Eliza Jane Tompkins, and died some years later in Oregon. His widow is now Mrs. McNeill. Her deposition is in the record. From such deposition, it appears that Pembroke Hoover lived at Cadillac, Michigan, and died in Oregon while temporarily away from home. She also testified to the identity of Robert Leroy Hoover as his father's only child. In view of the testimony of the witnesses from Ferris, Illinois, it is inconceivable that the plaintiff could be silent and yet be honest in his pretensions. If these witnesses were in error, it was plainly in the power of plaintiff to have demonstrated their error beyond debate. Plain it is that no explanation or denial was possible. Upon the evidence in this record, no jury could be warranted in finding the fact other than as the court found it. If the question had been tried to a jury, it would have been the duty of the court to direct a verdict, upon the evidence before us. If, therefore, the trial court had jurisdiction to find such fact, then it leaves the plaintiff without any interest or standing in the case. The questions he presents for our consideration become merely moot questions. If they were decided in his favor, he would still be without interest in the case, and therefore, in a legal sense, without interest in the questions which he presents. This explains why the emphasis of the appeal is laid on an attack upon the jurisdiction of the court.

II. One contention is that, inasmuch as the plaintiff's action was brought at law to set aside the probate of the will, and nothing more, it was not open to any defendant to introduce other and collateral multifarious equitable issues by counterclaim, and thus to prevent or to anticipate a jury trial upon the issues tendered in the petition, by pressing the equitable issues to an adjudication in advance of a jury trial of the law issues. This argument is quite fully met by the correction of an assumption upon which the argument is predicated. The assumption is that plaintiff's peti-

2. ACTIONS: joinder: improper joinder: defendant acquiescing in joinder: effect.

tion sought to set aside the probate of the will, and *nothing more*. The fact is that plaintiff's petition sought to set aside the probate of the will and *something more*. The "something more" is set forth in the following, which we quote from the petition itself:

"Plaintiff further states that one Robert Leroy Hoover filed a contest resisting the probate of said purported will, and alleging and fraudulently representing himself to be a son and heir at law of the said Margaret McHugh, deceased, whereas in truth and in fact he was not a son and not an heir at law of the said Margaret McHugh, deceased; that upon said false and fraudulent representations and assertions of the said Robert Leroy Hoover as aforesaid, the said D. H. Hedrick did enter into a written agreement of settlement with the said Robert Leroy Hoover, which agreement is on file in the matter of the estate of Margaret McHugh, deceased, and which settlement or agreement of settlement was approved by the court; that the said D. H. Hedrick, as executor or as residuary legatee under the said purported will of the said Margaret McHugh, deceased, had no authority to make settlement with the said Robert Leroy Hoover, and bind himself as executor of the estate of the said Margaret McHugh, deceased, to pay any sum or sums of money or any property belonging to the estate of the said Margaret McHugh, deceased, to the said Robert Leroy Hoover, and that said agreement or agreements on the part of the said D. H. Hedrick were without authority, and were and are void.

"Plaintiff further states that the records show, and therefore this plaintiff alleges, that one James A. Simmons, a brother of the said Margaret McHugh, filed a contest and resistance to the purported will and testament of the said Margaret McHugh, deceased, and that the said D. H. Hedrick did enter into and execute an agreement of settlement with the said James A. Simmons, for a consideration therein named; that the consideration named in said release and agreement of settlement has been paid, according to the

records, to the said James A. Simmons; that the said James A. Simmons is not an heir at law of the said Margaret McHugh, deceased; that the resistance and merits of his contest and the entire claim of the said James A. Simmons to a share in the estate of the said Margaret McHugh, deceased, was based upon fraud, in this, that he, the said James A. Simmons, stated that, prior to the death of the said Margaret McHugh, a contract or assignment had been executed between Margaret McHugh, deceased, and her alleged son, Robert Leroy Hoover; that the said claim of James A. Simmons to a share in said estate was based upon the fraudulent representations that Robert Leroy Hoover was a son of the said Margaret McHugh, deceased, and that said representations of the said James A. Simmons are and were false; that the said D. H. Hedrick had no authority from court, and in law or equity had no right or authority to pay James A. Simmons in settlement of his said claim any part of the estate of the said Margaret McHugh, deceased.

"Plaintiff further states that he finds, from reading the records filed in the estate of the said Margaret McHugh, deceased, that one J. H. Meyers, under a certain agreement of settlement, is to receive the sum of $15,000 from the estate of the said Margaret McHugh, deceased; that the said D. H. Hedrick, in law or in equity, has no right or authority whatsoever to pay to the said J. H. Meyers, or agree to pay to him, any sum or sums of money, or any property, from the estate of the said Margaret McHugh, deceased, for the reason that the said J. H. Meyers is not an heir at law of the said Margaret McHugh, deceased, and the said agreement to pay him money as aforesaid is without authority and is void.

"Plaintiff further states that his father was the only child of the said Margaret McHugh, deceased; that his said father is deceased, and at the time of his decease left no heirs surviving except this plaintiff, who, as such heir, under the statutes of Iowa, is the sole and only heir at law of the said Margaret McHugh, deceased."

The prayer of such petition not only prayed that the probate be set aside and the will be held null and void, but also "that the settlement and agreements of settlement made in said estate be set aside and declared null and void."

It will be noted that the plaintiff attacked the contract between Hedrick and Robert Leroy Hoover, and attacked the title of Robert Leroy Hoover thereunder, not on the ground that it must fail as a necessary effect of the setting aside of the will, but on the ground that it was obtained by false and fraudulent representations made by Robert Leroy Hoover that he was the son and heir of Margaret McHugh. Whether conveyances made to a good-faith purchaser while the original probate of the will was in force and effect would necessarily be rendered void thereafter by the successful prosecution of an action to set aside the probate, we need not determine. It would be open, at least, to an alleged good-faith purchaser to contend otherwise, in such event. The plaintiff's petition assumed that such contention could be made, and it tendered an issue in advance that the contract of conveyance to Robert Leroy Hoover was obtained through fraud. It may be that the issue so tendered was premature, and that it was improperly joined with an action to set aside the probate of the will; but the defendants were not bound to assail it upon that ground. The jurisdiction of the court was not affected by the misjoinder. It was competent for the parties to ignore it, and for the defendants to join issue with the petition in all its parts, regardless of the misjoinder. Robert Leroy Hoover responded to this part of the petition, both defensively and with a counterclaim. In his counterclaim, he set forth a specific description of the land which he claimed to own by virtue of his contract with Hedrick. He alleged that the plaintiff was asserting an interest in such lands adverse to himself, and that such adverse claim was a cloud upon his title, and he prayed that his title be quieted. Not only in his petition did the plaintiff assail the title of Robert Leroy Hoover, but, in his answer to the counterclaim, he ad-

mitted the allegation that he was claiming an interest·in said land adverse to the counterclaimant. In the final decree, defendant's title was quieted forever as against the plaintiff. In view, therefore, of the allegations and the prayer of the petition which we have above set forth, we deem it beyond debatable question that the plaintiff opened the door to this counterclaim, and that the trial court did not err in permitting it to stand; much less can it be said that the court exceeded its jurisdiction thereby. Whether, therefore, such counterclaim could have been permitted as against a mere petition at law to set aside the probate of the will, is quite beside the mark, and we need not enter upon that discussion.

III. It appears from the record that Robert Leroy Hoover did not file a counterclaim with his original answer. After the answer was filed, and before any counterclaim was on file, the plaintiff dismissed as. to Robert Leroy Hoover. Thereupon, Hedrick filed an application to require Robert Leroy Hoover to be made a defendant in the case, which application was granted, and the order was made. Robert Leroy Hoover therefore appeared again as defendant, and filed his counterclaim and cross-petition. It is argued that, by dismissal of the petition as to Robert Leroy Hoover, the trial court lost jurisdiction to try any issue between plaintiff and Robert Leroy Hoover, and that its order making Robert Leroy Hoover a defendant was in excess of jurisdiction.

3. ACTIONS: necessary parties: dismissal of necessary party: power of court to order party brought in.

In dismissing as to Robert Leroy Hoover, the plaintiff withdrew no allegation of his petition. Robert Leroy Hoover being a legatee under the will, it is doubtful at least whether the plaintiff could proceed with his contest without making such legatee a party defendant. Surely, this of itself would justify an order of the trial court requiring all such legatees to be served with notice, and to be thereby made defendants. Hedrick's particular reason for wanting to bring in Robert Leroy Hoover was that the contract by which he had under-

taken to convey certain property to Robert Leroy Hoover was assailed, on the ground that Robert Leroy Hoover had fraudulently represented himself as a son and heir of Margaret McHugh's, whereas he was not such. Manifestly, it was important at least to Hedrick that the same decree which should adjudicate such a fact adversely to him should also be binding upon Robert Leroy Hoover. If he were compelled to litigate separately with Stuart Isaac Hoover and with Robert Leroy Hoover, each claiming to be the heir of Mrs. McHugh, he might be unable to meet the contentions of either one, and might be beaten by each, and thereby rendered liable to both. We think, therefore, that there was neither lack of jurisdiction nor error on the part of the trial court in sustaining the application of Hedrick as such.

IV. It is further argued that the court usurped the functions of a jury in entering a decree, in that it precluded forever a jury trial on the issue of whether the probate of the will should be set aside.

4. ACTIONS: parties: genuineness of parties: impostor: power of court.

In legal effect, it precluded a future trial of such issue to a jury, however, only as to the plaintiff, and on the ground that he sustained no relationship to Mrs. McHugh, and could, therefore, have no interest or standing in such a contest. It is argued, however, that the question of his relationship was an issue in the case, and that he was entitled to try that question before a jury. If it be conceded that the question of plaintiff's relationship was one of the elements of the law branch of his case, then it was an element of the equity branch, likewise. So far as the mere question of jurisdiction is concerned, there was the same power to try such question in the equity branch as in the other branch. Strictly speaking, however, we think it was an element of neither. The identity of a pretended plaintiff is a question of fact somewhat distinct from the case itself. A case may be complete in all its own elements. Such case, however, may be either prosecuted or waived by the appropriate party to whose benefit it has

accrued. The disinterested, the intermeddler, the imperson-
ator, cannot prosecute it. Whether a plaintiff whose petition
presents a good case on its face is the identical person in
whose favor such case has accrued, is a question which stands
at the threshold of the litigation. The proper identity of
the plaintiff is a necessary condition to the prosecution of a
suit, rather than an element of the cause of action. It is a
question which, from its very nature, seldom presents a de-
batable issue. It is usually clearly provable, and the cases
are rare indeed where it has remained as an issue in the final
submission of the case. If the party who comes into court
as plaintiff is not the person he pretends to be, and is, there-
fore, not the party in interest, he has no right to the time
or attention of the court. As a matter of usual and appro-
priate practice, some presumption will be temporarily in-
dulged that he is what he claims to be. Ordinarily, this pre-
sumption is justified by the facts. If, however, his identity
is challenged by the defendant, it necessitates an investiga-
tion, and the manner and method of that investigation must
in some degree rest in the sound discretion of the court. We
know of no constitutional reason which would require that
the decision of such question should, as a matter of right, be
postponed until the final submission of the case to the jury.
Otherwise, a court might be required to spend days or weeks
in the trial of the issues of a case, after it had become appar-
ent that the plaintiff was a pretender and had no real interest
in the case which he was presenting. The fact being finally
found against his identity would, of necessity, carry down
with it the adjudication on the cause of action. For illustra-
tion, let a supposition be made. Suppose this case had been
submitted to a jury upon all the issues, and that special find-
ings had been returned therein to the effect that the will of
Mrs. McHugh was null and void for undue influence and
mental incompetency, and, further, that Stuart Isaac Hoover
sustained no relationship to her, whatever. Such a finding
would require a dismissal of the case. It would not be in

abatement. It would be a bar forever as against Stuart Isaac Hoover. But the finding of the invalidity of the will would necessarily be futile. The plaintiff being defeated, no judgment could be entered against the defendants in favor of a person in interest who was not a party to the case. Suppose, again, that the special findings were adverse to the identity of the plaintiff, and favorable to the validity of the will. Such finding in favor of the validity of the will would also be futile. It could not operate in favor of the defendant, as against a real heir who was not a party plaintiff.

There is much reason, therefore, for saying that the question of whether a plaintiff is genuinely such, or is a fraudulent pretender impersonating another, may, in the sound discretion of the court, be inquired into at any stage of the litigation, and in such reasonable manner as the court shall prescribe. This is only another way of saying that the judge is no more required to pass upon dilatory pleas and legal questions presented in advance of trial by a mere pretender or impersonator, than would a jury be required to pass upon a cause presented to them by the same pretender. In the case before us, it is sufficient to hold that the identity of the plaintiff was properly inquired into upon the trial of the equitable issues, and the finding of fact thereon was right, beyond all question. We do not overlook the fact that, in

5. APPEAL AND ERROR: parties entitled to allege error: impostor.

so far as the decree dealt with the counterclaim of Hedrick, it purported to adjudicate the validity of the will. It is argued that the validity of the will was not involved in the equitable issues, and that the question could not be prejudged in this manner. The correctness of the argument may be assumed, without being conceded. Such a finding in the decree was wholly needless, so far as the plaintiff was concerned. It was also wholly nugatory, as concerned any real heir not a party to the case, if any such should hereafter appear. The plaintiff himself, being barred by the adverse

finding as to his relationship, has no interest whatever to complain as to the form of decree, so far as it may purport to affect, hereafter, real parties in interest. So far as the validity of the will, as an abstract question, is concerned, it may be conceded that the decree added nothing to the presumption already obtaining in favor of its first probate. But this is a matter of no concern whatever to the plaintiff.

V. In view of what has already been said, we need not enter into the question whether, aside from all statutory provisions, the court had inherent right to dismiss the plaintiff's petition because of his contemptuous refusal to comply with the court's order. Consequences of such a refusal are specified in Sections 4656, 4667 and 4668, Code, 1897.

6. EVIDENCE: documentary evidence: order of court to produce: refusal to obey order: consequences.

These sections do not in terms authorize a dismissal of plaintiff's petition. Hence it is argued for appellant that the procedure specified in the statute is exclusive. It is plain, however, that an adherence to the statutory procedure would necessarily have come to the same result. Under Section 4668, the court could have ordered the allegations of defendants' pleadings to be taken as true. This would have been the equivalent of a dismissal. There could be nothing left for future trial, in the event of such order. This would have carried the equity issues, as well as the law issues. True, the court did not make such order, but did make one less drastic, which saved to plaintiff the right of defense upon the equitable issues. If we ignore the question of inherent right in the court to do what was done, and concede that it was technically erroneous to dismiss the petition, in the absence of a prior order that the pleadings of the adverse party "be taken as true," yet it was *error only,* and not excess of jurisdiction. On the one issue as to his identity, which was vital to his standing in court, he had a full and fair hearing, under due process of law. The finding being

7. APPEAL AND ERROR: parties entitled to allege error: impostor.

adverse to him, he had no interest in any other issue, and has no interest now in the correction of error pertaining thereto.

We find beyond all doubt that the plaintiff's claim of relationship to Mrs. McHugh was knowingly false, and the decree of the district court, so far as it affects him, is—*Affirmed.*

GAYNOR, C. J., DEEMER and LADD, JJ., concur.